1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN LENNARTSON, RITA ANDREWS, CASSIE ASLESON, SUSAN SHAY NOHR, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>        v.<br><br>PAPA MURPHY'S HOLDINGS, INC. and PAPA MURPHY'S INTERNATIONAL L.L.C.,<br><br>            Defendants. | No. 3:15-cv-05307-RBL<br><br>**DECLARATION OF KEN SPONSLER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Ken Sponsler, declare as follows:

1.      I am the Senior Vice President of CompliancePoint, Inc. ("CompliancePoint"). CompliancePoint is a global professional services firm specializing in consumer contact compliance consulting and audit services, located in Duluth, Georgia. CompliancePoint is a wholly-owned subsidiary of PossibleNOW, Inc.

2.      I was contacted by Jeffrey DeGroot of DLA Piper, counsel for the Defendants, Papa Murphy's Holdings, Inc. and Papa Murphy's International, L.L.C. ("Papa Murphy's") in the case captioned as *Lennartson et al. v. Papa Murphy's Holdings, Inc. et al.*, Case No. 3:15-cv-05307-RBS (W.D. Wash.) to assess the ability to ascertain the putative class members in this

DECLARATION OF KEN SPONSLER IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION - 1
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   case and also provide my own opinions concerning the availability of data with which one could

2   reliably and accurately identify the names and addresses of the subscribers and authorized users

3   of telephone numbers at a specific time in the past, if one has only the telephone number, the

4   telephone company name, and the date of dial associated with each number.

5         3.     I reserve the right to supplement this declaration as new information becomes

6   available.

7 **I.     Qualifications**

8         4.     I have over seventeen years of operational experience in business-to-business and

9   business-to-consumer global direct marketing compliance matters. I have personally conducted

10   dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have

11   assessed numerous call center operations on behalf of potential seller-clients as a due diligence

12   measure prior to sellers entering into contractual relationships for services. I have provided expert

13   reports in several TCPA-related matters including matters involving SMS/text messaging and

14   issues related to consent. I have also been retained as an expert witness in numerous cases

15   involving ascertainability of historical class members. CompliancePoint, Inc.'s consulting

16   practice founded by me, also provides historical call data compliance and wireless identification

17   services on behalf of law firms and corporate clients. These services include call data audits in

18   support of compliance monitoring and enforcement efforts. CompliancePoint's parent company,

19   PossibleNOW, Inc., is a provider of mobile telephone identity services. PossibleNOW has

20   maintained historical records of mobile telephone portability status since the beginning of U.S.

21   portability implementation in late 2003, wireless portability lists are updated daily and

22   PossibleNOW's record maintenance allows for historical calling records to be compared to the

23   applicable wireless portability list given the date(s) of the call record. Finally, as the Vice

24   Chairman of the board and member of the executive committee of the National Board of

25   Directors of the Professional Association of Customer Engagement ("PACE", formerly the

26   American Teleservices Association) I interact with hundreds of corporate compliance

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 2
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   professionals and companies/providers involved in consumer contact operations. A copy of my

2   current curriculum vitae ("CV") is attached hereto as Exhibit A. My compensation is not

3   dependent upon the outcome of this matter.

4       5.      My familiarity with consumer contact compliance industry standards began in

5   early 2000. After my transition from 27 years of military service, I worked as a project manager

6   for the development of a software product called, "The DNCSolution". This product enables

7   sellers and telemarketers to comply with federal and state Do Not Call laws by allowing

8   companies to check calling campaign lists against all federal and state Do Not Call lists,

9   company-specific Do Not Call lists, as well as wireless lists. My work on this project led to my

10  study of federal and state Do Not Call laws as well as exemption criteria. As the "DNCSolution"

11  product evolved to comply with more restrictive state laws, I realized the need for a consultative

12  service, and started a compliance consulting practice in 2005 to help clients understand how these

13  laws applied to them.

14      6.      CompliancePoint's compliance consulting practice revolves around assisting

15  sellers, service providers, and other related third parties to understand consumer contact

16  standards and regulations and to implement operational procedures to ensure compliance with

17  such standards and regulations. I have developed practices, systems, and training to ensure such

18  compliance. These include compliance officer training programs, call data compliance audits, as

19  well as seller-service bureau risk mitigation consulting.

20      7.      CompliancePoint's consulting practice monitors ever-changing federal and state

21  regulatory requirements, as well as civil actions and published materials from industry experts.

22  My years of experience in these matters involve a host of industry verticals such as financial

23  services, insurance, retail, home alarm services, satellite and cable services, teleservices, vacation

24  and cruise lines, lead generation, and the career college industries. CompliancePoint provides

25  compliance retainer services for over five dozen firms, including several Fortune 500 companies.

26

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 3
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

8.      I have assisted many clients to implement compliance standards in various due diligence areas including the development of:

- Corporate compliance governance procedures
- Compliance review committee charters
- Compliance policy and procedure manuals
- Compliance training and testing materials
- Escalation policy and procedure
- Critical task risk assessment analysis
- Agent quality assurance and compliance monitoring methodologies
- Compliance, record keeping and monitoring and enforcement contractual provisions

9.      I have provided training and instructions relative to consumer contact compliance in the following circumstances:

- Direct to consumer marketing compliance officer training courses for compliance staff and corporate legal departments
- Call center agent training regarding corporate Do Not Call policies
- College campus admissions representative training regarding telemarketing and corporate compliance
- Customer compliance awareness training for dialer technology providers
- Trade association compliance seminar presentations.

10.     Additionally, I have been retained to monitor compliance with court orders or settlements in the following instances:

- Monthly post-call data and call abandonment audit analysis and reporting
- Ongoing announced and unannounced call center audits
- Consumer call attempts monitoring to prevent over-dialing
- Call time restriction compliance monitoring

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 4
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    •    Admissions agent truthful disclosure monitoring.

2    11.    I provided consulting services to government and military organizations

3    implementing U.S. Army modularity design and organizational changes. I have undergone

4    specialized training at the U.S. Army Command Sergeant Major Course (Graduated with Honors)

5    and the Advanced Non-Commissioned Officers' Course (Distinguished Graduate). I retired from

6    the U.S. Military after achieving the highest enlisted rank of U.S. Army Command Sergeant

7    Major, of the 3rd Infantry Division, a 23,400-man elite combat team.

8    12.    On a regular basis, I conducted compliance-related webinar presentations to

9    PossibleNOW and CompliancePoint customers regarding operational compliance subject matter

10    such as:

11    •    Compliance with the TCPA final rules regarding calls/texts to wireless numbers

12    •    Federal and state enforcement and settlement action lessons learned

13    •    Changes to federal and state consumer contact laws

14    •    Global compliance and privacy updates

15    •    Trends in the mobile marketplace

16    •    Do Not Call and Call Abandonment safe harbor compliance

17    •    Telemarketer registration and bonding requirements

18    •    Do Not Call compliance data auditing lessons learned

19    •    Record keeping lessons learned from the Civil Investigative Demand

20    •    Federal and state established business relationship exemption criteria

21    •    Call time restriction compliance

22    •    Federal and state disclosure requirements

23    •    How to prepare and respond to federal and state investigative demands.

24    13.    I have been asked to provide presentations and colloquies and am a frequent

25    speaker at industry events, including but not limited to: PACE Annual Convention and

26    Washington Summit; Direct Marketing Association Teleservices Conference; College of

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 5
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   Information Assurance Professional's Governance; Risk and Compliance Summit; Noble Users'
2   Conference; The Association of Private Sector Colleges and Universities Annual Conference
3   (APSCU); The Customer Engagement Management (CEM) Conference; Dish Network's Annual
4   Retailer Conference; Campus Management Corporation (CMC) Annual Conference; Life Office
5   Management Association (LOMA); Quarterly Compliance Focused Webinar Presentations;
6   LeadsCon annual conference; and the Allied Solutions financial services member conference.

7        14.   I hold the following Registrations, Licenses, and Certifications: Customer
8   Engagement Certified Professional (CECP) by the Professional Association for Customer
9   Engagement (PACE); Certified Information Privacy Professional (CIPP/US) by the International
10   Association of Privacy Professionals (IAPP); and Certified American Teleservices Association
11   Self-Regulatory Organization Auditor (ATASRO).

12        15.   I have received the following professional recognition for my work in this field:

13           a.   PACE 2016 Pioneer Award. This award is presented annually to a member
14              who has demonstrated pioneering thought leadership and commitment to the
15              goals of the association and the industry. I received this award for the
16              development of the Customer Engagement Compliance Professional
17              Certification (CECP) program. This professional certification provides
18              education and standards for the consumer contact compliance professional,
19              including corporate compliance officers and attorneys. To date, over seventy
20              professionals have earned certification after participating in the extensive
21              study program and subsequently successfully passing a comprehensive two-
22              hour examination. The certification is awarded by the Professional
23              Association of Customer Engagement (PACE).

24           b.   PACE Chairman's Award for Leadership (2014).

25           c.   Eighteen separate personal awards by the U.S. Army, including the Legion
26              of Merit.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 6
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

## II.    Summary of Expert Experience

16.    In the last four years, I have been qualified as an expert in Federal District Court and have been retained to provide deposition testimony as an expert in the following matters:

*Horton v. Cavalry Portfolio Svcs*., No. 3:13-cv-00307-JAH-WVG (S.D. Cal.); *Shamann v. Monex Credit Co*., Arbitration Proceeding JAMS Reg. 1200041941; *Molnar v. NCO Financial Systems, Inc*., Nos. 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.); *Hooker v. Sirius XM*, No. 13-cv-0003 (E.D. Va.); *True Health Chiropractic, Inc. v. McKesson Corp*., No. 13-cv-02219 (N.D. Cal.); *Bridge v. Credit One Bank*, No. 2:14-cv-01512 (D. Nev.); *Raffin v. Medicredit, Inc*., No. 2:15-cv-04912 (C.D. Cal.); *Keim v. ADF Midatlantic*, LLC et al., No. 9:12-cv-80577 (S.D. Fla.); *Marcus v. CVS Pharmacy, Inc*., No. 3:15-cv-00259 (D. N.J.); *Tomeo v. Citigroup, Inc. and CitiMortgage, Inc*., No. 1-13-cv-04046 (N.D. Ill.); *Tillman v. Ally Financial, Inc*., No. 2:16-cv-00313 (M.D. Fla.); and *Slovin v. Sunrun, Inc. et al.,* No. 4:15-cv-05340 (N.D. Cal.).

I also provided trial testimony in federal court in the matters *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D. Ill.) and *ADT Security Services Inc., v. Security One International*, No. 11-cv-05149 (N.D. Cal.).

17.    Materials reviewed and relied upon:

I have reached the conclusions set forth below based on my review of Anya Verkhovskaya's expert report and the materials cited by Ms. Verkhovskaya, as well as other case materials made available to me listed in Exhibit C.

## III.    Methodology

18.    In drafting this report and rendering my opinions in this case, I considered the above documents made available to me by Papa Murphy's. I further relied on my experience in the consumer engagement industry in general as well as my compliance work with dozens of companies, including specifically with regard to TCPA compliance. I stay current with industry

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 7
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1 developments—both in terms of technology and compliance—and this has also informed my

2 opinions.

3 **IV.     Statement of Opinions:** It is my opinion that Papa Murphy's business practices were and

4 are to send text messages only to consumers who have opted in to receive them and consumer

5 opt-outs are honored in accordance with regulatory requirements, as well as Mobile Marketing

6 Association and CITA (the wireless association) standards. It is also my opinion that the names

7 and addresses of individuals, who allegedly received the text messages at issue in this case,

8 cannot reliably be identified through objective or administratively feasible means, as there is no

9 reliable method to determine historical authorized users or subscribers of all of the mobile

10 telephone numbers that would be included within the putative class definition proposed in the

11 First Amended Class Action Complaint. This is particularly problematic here where the text

12 messages at issue were allegedly received by proposed class members years ago and the relevant

13 time period for the putative class stretches back to 2013—a period of over four years. It is my

14 understanding that the named Plaintiffs seek to represent the following class:

15
16
17
**National Class**
All persons or entities in the United States and its Territories who received one or more text message advertisements from or on behalf of Defendants between October 16, 2013, and June 15, 2015.

18 Furthermore, Plaintiff Asleson and Plaintiff Nohr also seek to represent a sub-class, the

19
20
**Washington Class**
All persons or entities in Washington who received one or more text message advertisements from or on behalf of Defendants between October 16, 2013, and June 15, 2015.

21
22
**V.     Plaintiff Backgrounds:**

23 19.     John Lennartson (one of the named Plaintiffs) alleges he received a text message

24 on his mobile telephone from short code 904-21 on or around April 6, 2015. Plaintiff Lennartson

25 presents as evidence only some screenshots of one or more unknown mobile telephone(s)

26 showing text messages from 904-21 informing the receiver of the text message of an available

discount for a certain type of pizza at participating Papa Murphy's locations and to reply STOP

---

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 8
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    to end the receipt of such messages. The screenshot of this unidentified mobile telephone does

2    not show the telephone number associated with it. Plaintiff Lennartson claims that he received at

3    least 26 such texted coupon alerts and that eight of them were received after the original

4    Complaint in this action was filed. Plaintiff Lennartson does not state when he opted in to receive

5    such messages, nor does he state when he opted out of receiving additional such text messages,

6    or if indeed he ever did.

7         20.    Rita Andrews (one of the named Plaintiffs) states only that Papa Murphy's

8    obtained her telephone number and began transmitting text message advertisements after October

9    16, 2013.

10         21.    Cassie Asleson (one of the named Plaintiffs) states only that Papa Murphy's

11    obtained her telephone number and began transmitting text message advertisements after October

12    16, 2013.

13         22.    Susan Shay Nohr (one of the named Plaintiffs) states only that she received text

14    message advertisements from Papa Murphy's.

15    **VI.**    **Opinion One:** Papa Murphy's SMS/texting business and operational practices dictated

16    and continue to dictate that texts will ONLY be initiated to consumers who have specifically

17    opted in to the texting program(s).

18         **a.**  **Facts in Support:** According to the Declaration testimony of Andrew Brawley,

19             Email and Mobile Marketing Manager at Papa Murphy's International, L.L.C.,

20             consumers can only be included in a Papa Murphy's texting program if they take

21             specific actions to opt in.[1] This can be accomplished in one of two ways. These

22             include consumers texting into a Papa Murphy's short code as well as signing up for

23             the texting program/promotion through the Papa Murphy's website

24             (https://www.papamurphys.com/). The consumer text-to-short-code-option would

25             appear in Papa Murphy's advertisements on media such as coupons, flyers, print

26

---

[1] Declaration of Andrew Brawley, September 24, 2015, ¶ 5, 14-20 and 1-21.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 9
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    media, and so on. Papa Murphy's did not purchase lead lists, perform any type of

2    referral program or use any data mining services to build or add to SMS/text recipient

3    lists.[2] Also, as a matter of policy, Papa Murphy's did not and will not add consumer

4    telephone numbers to any SMS/texting list simply because customers provided their

5    telephone number for any other purpose.[3]  Consumers were and are only included in

6    the SMS/text programs when they opted in (expressed a desire) to receive such texts.

7    Additionally, and in accordance with regulatory as well as MMA and CITA

8    guidelines, Papa Murphy's provided for and honored any consumer's request that

9    further texts cease.

10   **VII.    Opinion Two:** The available SMS/text records in this case do not indicate whether

11   intended recipients actually received the message.

12           **a.    Facts in Support:** The SMS/text related data sheets that have been produced and

13              that I have reviewed do not provide definitive information regarding which intended

14              recipients of Papa Murphy's text messages actually received them successfully.

15              There are numerous reasons that text messages might not be received by the intended

16              recipients on their mobile device.

17           b.    Consumers are under no obligation to report changed telephone numbers to Papa

18              Murphy's; there exists no definitive evidence that an analysis of Papa Murphy's

19              Customer Relationship Management ("CRM") database to identify mobile telephone

20              numbers means that any texts were received by those consumers. Consumers

21              themselves could direct the carrier to turn off the text messaging functionality on

22              their mobile telephones.

23           c.    In addition to the facts above, there are other factors that can impact whether a text

24              can be delivered successfully. Text messaging works in a fairly complex chain

25              involving several SMS aggregator, connectivity, and number formatting

26

---

[2] Id., ¶ 5, 1-3.
[3] Id., ¶ 3, 7-8

DECLARATION OF KEN SPONSLER IN SUPPORT                    DLA Piper LLP (US)
OF RESPONSE TO MOTION FOR CLASS                        701 Fifth Avenue, Suite 7000
CERTIFICATION - 10                              Seattle, WA  98104-7044 | Tel: 206.839.4800
No. 3:15-cv-05307-RBL

requirements. The message may first be sent to an aggregator, which can sometimes cause delays, especially if there are technical issues or maintenance. Local towers and carriers may also experience technical difficulties, which can result in the end-user not successfully receiving a message.

d.  Many consumers today use pre-paid or "burner" phones such as those available for purchase at any number of retail stores like Walmart, etc. Purchasers of pre-paid services purchase minutes and data. Usage of the device through texts/calls etc. debit the available minutes. When the pre-paid minutes are used up, messages will not be delivered. Consumers must recharge their accounts in order for service to resume.

e.  Carriers also maintain a so-called "blacklist", which is an internal list that carriers maintain for their subscribers, who have informed them that they do not wish to receive certain or any text messages. In the industry, this "blacklist" is also referred to as a carrier opt-out.

f.  Intended recipients may also have the ability to "block" messages from specific senders. This is a common option available to many consumers. As a matter of fact, my professional and personal experience shows that many consumers sign up with retailers to receive the discount-SMS and as soon as they have received such, block the retailer's number on their cellular device. If the consumer decides to block future texts or calls from a caller/initiator, then the hand set or mobile device does not receive the text or call. In my experience, many text message service aggregators also inform customers or users of the service that *"[t]here can be no assurances that (a) the Services will be accepted by any or all of the Carriers, or (b) that any or all of the Carriers will maintain connectivity with our service"*. These contractual limitations offer additional insights into the question of whether the relevant text messages may not have been forwarded by the carrier and may not have been

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 11
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

received by every mobile telephone number in Papa Murphy's texting campaign spreadsheets relevant to this case.

g.   Finally, SMS/text aggregators typically do not have contractual relationships with all of the over 700 carriers in the US. Aggregators are a vital link in the connectivity chain from message initiator through the aggregator, to the carrier and finally to the consumer mobile device. Aggregators work with carriers in order to ensure messages are "addressed" correctly so that they are routed to the correct carrier as well as ensuring that the message content/opt-out mechanisms and so on, meet the carrier's requirements. While aggregators typically have agreements in place with all of the major carriers, which would account for roughly 85 percent, they may not have agreement with many of the smaller carriers. In those cases, messages will not be delivered.

The evidence is clear that all intended recipients would definitely not have received texts.

**VIII.   Opinion Three:** Papa Murphy's SMS/text related data sheets do not reveal sufficient information by which to reliably identify recipients or intended recipients of the alleged SMS/text messages at issue.

a.   **Facts in Support:** Papa Murphy's SMS/text messaging offers to its consumers required very little information. Consumers were only asked to provide first and last name, date of birth and phone number. However, as indicated in a summary analysis of the Papa Murphy SMS/text spreadsheets in evidence, the data elements provided by consumers are often missing key and essential information needed to identify intended recipients. In many cases, the information that was provided is incomplete or appears to be very likely false or inaccurate.

**Data Sheet PM0000381**

Total # of rows: 18,637

# of rows that have any entry in "first name", initial only or more: 3,343

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 12
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# of rows that have any entry in "last name", initial only or more: 5,254

21 entries: last names of Smith, no first name.

**Examples:**

| | ID | first_name | last_name | Birthdate | |
|---|---|---|---|---|---|
| | 13976621 | 2177614993 | amber | 12/31/1969 | First name provided is the same as ph # provided |
| | 5434238 | A | V | 0000-00-00 | |
| | 12417916 | t | schn | 12/31/1969 | |
| | 7862082 | rv | atk | 0000-00-00 | |
| | 5434206 | S | B | 0000-00-00 | |
| | 7543351 | s | a | 0000-00-00 | |
| | 11354124 | s | n | 12/31/1969 | |
| | 5432741 | | J | 0000-00-00 | |
| | 12526305 | J | F | 12/31/1969 | |
| | 13715663 | B | M | 12/31/1969 | |
| | 8688463 | Sue | Rpss | 0000-00-00 | |
| | 14088187 | M | r | 12/31/1969 | |
| | 13343753 | K | T | 10/22/2014 | |
| | 4911872 | | bs | 0000-00-00 | |
| 1 | 4911278 | | Smith | 0000-00-00 | |
| 2 | 4157953 | | Smith | 0000-00-00 | |
| 3 | 4911394 | | Smith | 0000-00-00 | |
| 4 | 4911460 | | Smith | 0000-00-00 | |
| 5 | 4911765 | | Smith | 0000-00-00 | |
| 6 | 5431649 | | Smith | 0000-00-00 | |
| 7 | 5431692 | | Smith | 0000-00-00 | |
| 8 | 5431703 | | Smith | 0000-00-00 | |
| 9 | 5431711 | | smith | 0000-00-00 | |
| 10 | 5431736 | | Smith | 0000-00-00 | |
| 11 | 5431802 | | Smith | 0000-00-00 | |
| 12 | 5431903 | | smith | 0000-00-00 | |
| 13 | 5432251 | | Smith | 0000-00-00 | |
| 14 | 5432271 | | smith | 0000-00-00 | |
| 15 | 5432458 | | SmIth | 0000-00-00 | |
| 16 | 5432532 | | Smith | 0000-00-00 | |
| 17 | 5432578 | | Smith | 0000-00-00 | |
| 18 | 5432604 | | Smith | 0000-00-00 | |
| 19 | 5432756 | | Smith | 0000-00-00 | |
| 20 | 5432821 | | Smith | 0000-00-00 | |
| 21 | 5433118 | | Smith | 0000-00-00 | |
| | 13443583 | c | c | 12/31/1969 | |
| | 5431680 | | Willliams | 0000-00-00 | |

**Data Sheet PM0000554**

Total # of rows: 58, 526

# of rows that have any entry in "first name", initial only or more: 32,828

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 13
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# of rows that have any entry in "last name", initial only or more: 38,625

63 entries last names of Smith, no first name.

6 entries last name initial "b" or "B", no entry for first name

**Examples:**

| | ID | first_name | last_name | birthdate |
|---|---|---|---|---|
| | 11963966 | dust | off | 12/31/1969 |
| | 6266280 | | Superstar | 0000-00-00 |
| | 13176437 | Thomas | The Great | 12/31/1969 |
| | 11295115 | ben | thebadass | 12/31/1969 |
| | 14193747 | Jon | tomorrow | 12/31/1969 |
| | 6268062 | | woman | 0000-00-00 |
| | 13226552 | Tom | TRUE | 12/31/1969 |
| | 6275792 | | TRUE | 0000-00-00 |
| | 12812497 | Deena | Zook | 12/31/1969 |
| | 13365416 | gary | zook | 12/31/1969 |
| | 6564736 | Tracy | Zook | 0000-00-00 |
| | 6271415 | | Zook | 0000-00-00 |
| 1 | 6265642 | | Smith | 0000-00-00 |
| 2 | 6265679 | | smith | 0000-00-00 |
| 3 | 6266170 | | smith | 0000-00-00 |
| 4 | 6266589 | | Smith | 0000-00-00 |
| 5 | 6266707 | | Smith | 0000-00-00 |
| 6 | 6266818 | | smith | 0000-00-00 |
| 7 | 6266838 | | Smith | 0000-00-00 |
| 8 | 6266841 | | Smith | 0000-00-00 |
| 9 | 6266939 | | Smith | 0000-00-00 |
| 10 | 6267145 | | smith | 0000-00-00 |
| 11 | 6267356 | | Smith | 0000-00-00 |
| 12 | 6267478 | | Smith | 0000-00-00 |
| 13 | 6268249 | | Smith | 0000-00-00 |
| 14 | 6268264 | | smith | 0000-00-00 |
| 15 | 6268470 | | Smith | 0000-00-00 |
| 16 | 6268622 | | Smith | 0000-00-00 |
| 17 | 6268778 | | Smith | 0000-00-00 |
| 18 | 6268779 | | Smith | 0000-00-00 |
| 19 | 6268822 | | Smith | 0000-00-00 |
| 20 | 6268917 | | smith | 0000-00-00 |
| 21 | 6269117 | | Smith | 0000-00-00 |
| 22 | 6269336 | | Smith | 0000-00-00 |
| 23 | 6269706 | | Smith | 0000-00-00 |
| 24 | 6269788 | | Smith | 0000-00-00 |
| 25 | 6269873 | | Smith | 0000-00-00 |
| 26 | 6269884 | | Smith | 0000-00-00 |
| 27 | 6269885 | | Smith | 0000-00-00 |
| 28 | 6269983 | | Smith | 0000-00-00 |
| 29 | 6270273 | | Smith | 0000-00-00 |
| 30 | 6270309 | | Smith | 0000-00-00 |

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 14
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104-7044 | Tel: 206.839.4800

| | ID | first_name | last_name | birthdate | |
|---|---|---|---|---|---|
| 31 | 6270470 | | Smith | 0000-00-00 | |
| 32 | 6270668 | | Smith | 0000-00-00 | |
| 33 | 6270878 | | Smith | 0000-00-00 | |
| 34 | 6270886 | | smith | 0000-00-00 | |
| 35 | 6271289 | | Smith | 0000-00-00 | |
| 36 | 6271357 | | smith | 0000-00-00 | |
| 37 | 6271381 | | Smith | 0000-00-00 | |
| 38 | 6271444 | | smith | 0000-00-00 | |
| 39 | 6271554 | | Smith | 0000-00-00 | |
| 40 | 6271794 | | Smith | 0000-00-00 | |
| 41 | 6272181 | | Smith | 0000-00-00 | |
| 42 | 6272195 | | Smith | 0000-00-00 | |
| 43 | 6272336 | | smith | 0000-00-00 | |
| 44 | 6272622 | | Smith | 0000-00-00 | |
| 45 | 6272869 | | Smith | 0000-00-00 | |
| 46 | 6273037 | | Smith | 0000-00-00 | |
| 47 | 6273088 | | Smith | 0000-00-00 | |
| 48 | 6273174 | | Smith | 0000-00-00 | |
| 49 | 6273403 | | Smith | 0000-00-00 | |
| 50 | 6273598 | | Smith | 0000-00-00 | |
| 51 | 6273704 | | smith | 0000-00-00 | |
| 52 | 6273746 | | Smith | 0000-00-00 | |
| 53 | 6274529 | | Smith | 0000-00-00 | |
| 54 | 6274611 | | Smith | 0000-00-00 | |
| 55 | 6274630 | | smith | 0000-00-00 | |
| 56 | 6274671 | | Smith | 0000-00-00 | |
| 57 | 6274782 | | Smith | 0000-00-00 | |
| 58 | 6274864 | | smith | 0000-00-00 | |
| 59 | 6275009 | | Smith | 0000-00-00 | |
| 60 | 6275043 | | Smith | 0000-00-00 | |
| 61 | 6275352 | | Smith | 0000-00-00 | |
| 62 | 6275949 | | Smith | 0000-00-00 | |
| 63 | 6276076 | | Smith | 0000-00-00 | On this spreadsheet alone, 63 entries with no first name, last name Smith, which could be true or not and if true, impossible to ascertain the actual person. |
| | 6273083 | Carl | Smith II | 0000-00-00 | |
| | 6274872 | | Smith II | 0000-00-00 | |
| | 13426817 | | 3 | 12/31/1969 | |
| | 13893766 | | 9 | 12/31/1969 | |
| | 7449853 | | 4255184693 | 0000-00-00 | Last name same as the cell phone # provided |

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 15
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

| ID | first_name | last_name | birthdate | |
|---|---|---|---|---|
| 12586716 | bryan | 0ertl | 12/31/1969 | Last name starts with a zero, not a capital O |
| 10979313 | Heather | DueÃ±as | 12/31/1969 | Last name includes unusual characters |
| 6273164 | | 6615 Commercial Ave | 0000-00-00 | |
| 14448580 | Cody | | 12/22/2014 | |
| 12209483 | Df0f1 | | 12/31/1969 | |
| 14609986 | Dianne | | 1/1/2015 | |
| 6272359 | | ch | 0000-00-00 | |
| 6272245 | | E | 0000-00-00 | |
| 6270808 | | fu | 0000-00-00 | |
| 6268791 | | G | 0000-00-00 | |
| 6269040 | | g | 0000-00-00 | |
| 6267400 | | G. | 0000-00-00 | |
| 7909379 | vickie | glrnn | 0000-00-00 | |
| 6265966 | | H | 0000-00-00 | |
| 6268310 | | In | 0000-00-00 | |
| 6271574 | | K | 0000-00-00 | |
| 12397197 | t | ly | 12/31/1969 | |
| 6276068 | | Ko | 0000-00-00 | |
| 6267703 | | m | 0000-00-00 | |
| 6271723 | | M | 0000-00-00 | |
| 6272094 | | M | 0000-00-00 | |
| 12742928 | A | Mre | 12/31/1969 | |
| 6270258 | | O | 0000-00-00 | |
| 6268259 | | P | 0000-00-00 | |
| 6272426 | | P | 0000-00-00 | |
| 6269604 | | Pattterson | 0000-00-00 | |
| 6268896 | | person | 0000-00-00 | While it certainly is possible that there are persons whose last name is "person", it is highly likely that this is just a take-off on the word 'person' |
| 6270466 | | Person | 0000-00-00 | While it certainly is possible that there are persons whose last name is "person", it is highly likely that this is just a take-off on the word 'person' |
| 6270483 | | Person | 0000-00-00 | While it certainly is possible that there are persons |

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 16
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

| ID | first_name | last_name | birthdate | |
|---|---|---|---|---|
| | | | | whose last name is "person", it is highly likely that this is just a take-off on the word 'person' |
| 6265753 | | R | 0000-00-00 | |
| 6268772 | | R | 0000-00-00 | |
| 6272576 | | R | 0000-00-00 | |
| 6273086 | | Robbbins | 0000-00-00 | |
| 14281537 | Haroldw59 | Weber | 12/31/1969 | |
| 6270382 | | S | 0000-00-00 | |
| 6276025 | | s | 0000-00-00 | |
| 10962274 | iuli` | sd` | 12/31/1969 | Last and first name include unusual characters |
| 6272177 | | Sweeet | 0000-00-00 | |
| 6272256 | | Torrrison | 0000-00-00 | |
| 6266946 | | W | 0000-00-00 | |
| 6276019 | | W | 0000-00-00 | |
| 6265905 | | W. | 0000-00-00 | |
| 8932172 | Anne | AuvÃƒÂ© | 0000-00-00 | Last name includes unusual characters |
| 6271527 | sarah | courtneyluvsmela@hotmail.com | 0000-00-00 | |

**Data Sheet PM1015530**

Total # of rows: 73,792

# of rows that have any entry in "first name", initial only or more: 26,134

# of rows that have any entry in "last name", initial only or more: 31,620

**Examples:**

| ID | first_name | last_name | Birthdate | |
|---|---|---|---|---|
| 4899224 | | 55346 | 12/31/1969 | |
| 4591366 | Nicole | 0'Connor | 12/31/1969 | Last name starts with a zero, not a capital O |
| 14119522 | rebecca | TRUE | 12/31/1969 | |
| | | | | |

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 17
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

b.   While consumers interested in taking advantage of receiving a coupon for Papa Murphy's products entered a mobile telephone number, the vast majority did not enter any information in the other fields, such as first and last name, birthdate (mm/dd, plus an unchecked box for the consumer to check to confirm he or she is over 18). It cannot be determined if any of these provided names are true and accurate. From my own personal experience and that of my family and friends, I am aware that quite a few people are uncomfortable providing their true and correct names on the Internet to receive a discount for, as in this case, pizza. This phenomenon is also supported by post-call data analyses I have been involved in as part of CompliancePoint's data auditing services. Additionally, Papa Murphy's did not attempt or even provide a means for consumers interested in receiving SMS/text messages to provide a business or residential address.

**IX.   Opinion Four:** Ms. Verkhovskaya's opinion (¶¶ 32-39) that members of the two classes in this case can be reliably identified is unsubstantiated and pure conjecture. Furthermore, in my opinion described below, it is impossible to accurately determine the identity of the regular users of mobile telephones relevant to the class periods.

**Facts in Support:** In paragraph 33 of Ms. Verkhovskaya's report, she describes a proposed method of identifying proposed class members by using a "reverse-append" service through Lexis Nexus. In relevant part, Ms. Verkhovskaya states "The resulting output file provides a comprehensive report of subscribers of the telephone numbers, including name, address, and associated date ranges." Ms. Verkhovskaya does not describe the elements contained within this "comprehensive" report or the data sources used to create it including the reliability thereof, or the process by which this data is produced. When differing sources report dissimilar information regarding the same telephone number which source is used and why? Which sources have more weight that others and why? What is the proven reliability of this process?  By her own admission,

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 18
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

Ms. Verkhovskaya indicates the resulting report will identify "subscribers". However, based upon my experiences in post call data analysis as well as wireless identification services, many of the mobile telephone numbers were provided by regular or "authorized users" of the telephones who are NOT subscribers and therefore would not be identified at all or misidentified. I explain in other sections of this report other factors that severely impact the accuracy and reliability of Ms. Verkhovskaya's proposed method for identifying proposed class members.

   a.   Every mobile telephone number in Papa Murphy's CRM system is provided by consumers, many of whom were interested in receiving discounts for Papa Murphy's products; Papa Murphy's only collects contact information (and collected during the relevant time periods) from consumers who initiate an inbound text to a Papa Murphy's short code or go on Papa Murphy's website and sign up and agree to share their contact information with Papa Murphy's. My review of all available case-related materials reveals that during the relevant class periods Papa Murphy's did not purchase telephone number lead lists and did not obtain telephone numbers via skip tracing or contact consumers through any sort of referral programs. However, the historical identity of regular or authorized users (consumers who actually provided their mobile telephone numbers to Papa Murphy's) of mobile telephones is not possible for numerous reasons.

   b.   First, as my review of the consumer information data relevant to the SMS/text programs indicates, there are no consistent reliable elements of data to which a telephone number can be associated. Lacking are verified full and true names as well as addresses. This leaves the telephone number itself, which of course does not reveal the identity of the alleged recipient of a successful text message historically.

   c.   According to data published by Statistica regarding mobile telephone churn rate between 2013 and 2016, the first quarter of 2014 saw a monthly churn rate of nearly

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 19
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

14 percent. Churn rates indicate the percentage of customers who ended their relationship with their then-current carriers. Additionally, these statistics only reported on the churn rates of the major carriers.[4] Churn is an indicator that statistically, around 14 percent of major carrier customers (would be higher for all carriers) have moved on to different carriers since providing their telephone number to Papa Murphy's. Some consumers may also port their old telephone numbers to the new carrier but certainly not all consumers. There are several factors that may prevent consumers from porting their existing telephone number. For instance, authorized users of telephones within a family share plan, who are not the subscribers, would not be allowed to port to another carrier. This includes business-provided telephones, where the business / employer is the subscriber. Attempts to port numbers into an existing account with a different carrier may also be denied, as well as attempts to port numbers with a carrier that is not licensed in the consumer's area. These factors indicate that the reliable identification of consumers today, who may have received a text more than four years ago, is not possible.

**Problems Ascertaining Historic Mobile Subscriber Information.**

• **Name Directories:** As a preliminary matter, there is no available list of current or historical mobile telephone numbers (such as the White Pages or the 411-directory assistance databases for landlines). Some wireless carriers participate in a Caller Name ("CNAM") database. This facilitates the transmission of caller ID information similar to landline telephone services. The CNAM database is voluntary and subscribers must pay additional fees for this feature (which is usually bundled with other premium features). As a result, it is not universally available even among wireless carriers that offer the service. Another factor is carrier participation in the database—among the major carriers, AT&T, Sprint, T-Mobile, and Verizon are accounted for in this database, but Verizon

---

[4]  https://www.statista.com/statistics/283511/average-monthly-churn-rate-top-wireless-carriers-us/  (Last  accessed November 10, 2017)

1    Wireless has not been participating to date. Finally, CNAM is relevant only for current

2    subscribers, and even then, the data is not completely reliable due to latency in updates

3    and inaccurate information provided by the wireless carriers. I am unaware of any source

4    for CNAM data from a historical perspective going back to 2013 or earlier.

5    •    **Commercial ID Services:** While PossibleNOW, LexisNexis, Neustar, and others

6    provide commercially available identification services, these do not provide reliably

7    correct information. My research indicates that a significant percentage of the numbers

8    in these databases provide no consumer name information. Additionally, in many

9    instances the consumer information provided is either inaccurate or uses abbreviations

10   and nicknames. The prevalence of family plans or friends-and-family plans, popular

11   because there is no credit check for the additional users, also renders these databases

12   ineffective as a reliable means to identify historical users as the databases often do not

13   account for common users of the telephone number (*i.e.*, children, spouse, grandparents,

14   even friends of the family, etc.). [5]

15   •    **Mobile Telephone Number Reassignment:** In my experience, the name and

16   address associated with a wireless telephone number today may not be the same person

17   that owned the telephone number at a specified date in the past. Tens of millions of

18   numbers are recycled each year.[6] The high number of mobile telephone reassignments

19   makes it difficult to reliably identify historical users of mobile telephone numbers. I am

---

[5] A disclaimer on websites for such databases typically cautions the user along the following lines, "Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on any data, it should be independently verified."

[6] 2015 Omnibus Order, 30 FCC Rcd at 8077–78 (Pai, dissenting) ("[C]onsumers don't preemptively contact every business to which they have given their number to inform them of the change. So even the most well-intentioned and well-informed business will sometimes call a number that's been reassigned to a new person. After all, **over 37 million telephone numbers are reassigned each year**. And no authoritative database—certainly not one maintained or overseen by the FCC, which has plenary authority over phone numbers—exists to 'track all disconnected or reassigned telephone numbers' or 'link[] all consumer names with their telephone numbers.' . . . [T]rial lawyers have sought to apply a strict liability standard on good-faith actors—so even if a company has no reason to know that it's calling a wrong number, it'll be liable.").

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 21
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

not aware of any solution or database that addresses the challenges brought on by reassigned mobile numbers. In other words, there is no database in existence today that can reliably identify a prior user of a cellphone at a specific point in time in the proposed time frame of October 13, 2013 to June 15, 2015 in this action. The current publicly available databases are unreliable for a number of reasons, including because customer records are often linked to the wrong mobile number and because these databases can only account for subscriber information rather than common user information.

The FTC and FCC administration of the National Do Not Call (DNC) Registry provides an example of the inability to reliably identify reassigned wireless numbers used at a specific point in the past. The Do Not Call Improvement Act of 2007 became effective in February of 2008. Previously, telephone numbers on the DNC registry expired after five years. The Act changed this, so that numbers placed on the registry remain permanently. When this change was made, the FTC and FCC implemented a "hygiene" process whereby telephone numbers contained within the DNC registry that were disconnected from the original subscriber and reassigned to a different subscriber name as well as a different address are removed. CompliancePoint's parent company, PossibleNOW, Inc. is the subcontractor selected to perform this hygiene process. However, the hygiene process ONLY removes land line (residential) telephone numbers, as there is no reliably available data source to track disconnects and reassignments of mobile telephone users. The FTC acknowledged this fact in its 2008 Report to Congress. In relevant part, the FTC wrote, "Wireless carriers are not required to provide information to the National Directory Assistance (NDA) related to their disconnected or reconnected telephone numbers. FTC staff will continue to work with the subcontractor on ways of addressing the accuracy of cellphone registrations."[7] This fact further evidences the difficulty involved in accurately identifying users of mobile telephones.

---

[7] Discussion of the process to maintain the accuracy of the DNC Registry. Page 6, Do Not Call Improvement Act Report to Congress October 2008.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 22
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1            Another complication concerning the identification of cellphone subscribers is

2   that many major mobile telephone carriers offer their subscribers the option to change

3   their wireless number without changing the carrier, in some cases as often as every 24

4   hours.

5   **Virgin Mobile[8]**

6            Ability: Once every 24 hours. No fee.



---

[8] https://community.virginmobileusa.com/t5/iPhone/Changing-phone-number/td-p/12431  (Link  last  accessed November 9, 2017.)

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 23
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1  **Sprint[9]**

2       Ability: Up to three (3) times in 30 days. No fee.

3

## Change your phone number and/or address on Sprint.com

There may be occasions where you need to change your phone number. You can change your phone number to a different number anywhere Sprint provides service. There is no fee for changing your number when using My Sprint.

**Review the restrictions below.**

1. You cannot choose a specific number. A new number will be randomly assigned.
2. You cannot change your phone number more than 3 times in 30 days.
3. Once your phone number is changed, you cannot switch back to your current number.
4. You will need to set up a new voicemail account and all your saved voicemail messages will be lost.
5. Changing your phone number will remove block or allow lists associated with that number. You will need to manually set up these lists for your new number.
6. You cannot port over a number from another carrier through this self-service process.

[ Change your phone number ]

⊕ Step by step instructions to change your phone number on sprint.com

**IMPORTANT:**

Your phone will need to be programmed with your new phone number. Many of our phones program automatically over the air on our network.

1. Turn on your phone.
2. Wait a minute and then try to make a phone call. If you succeed, you are done.

If you cannot make a phone call, you will need to manually enter the information below to complete programming:

1. Master lock code
2. New phone number
3. MSID(IMSI)

It may take up to 72 hours for the new phone number to display for Caller ID. **Please wait 15 minutes for your new number to appear on sprint.com.**

If you still cannot make calls after manual programming your phone, please chat with an agent at www.sprint.com/chat or visit a local retail store for programming assistance.

Last updated Fri Jul 07 2017

22  **AT&T[10]**

23

24       Ability: No frequency limitation listed. No fee within 30 days of activation.

25       $36 change fee after 30 days.

26

---

[9]  https://www.sprint.com/en/support/solutions/device/change-your-phone-number-area-code-or-address-on-sprint-com.html (Link last accessed November 9, 2017.)
[10] https://www.att.com/esupport/article.html#!/wireless/KM1011568 (Link last accessed November 9, 2017.)

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 24
No. 3:15-cv-05307-RBL

DLA PIPER LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# Change your wireless number

Learn how to get a new wireless number without changing your installment plan or contract.

| Wireless | AT&T PREPAID |
| --- | --- |

INSTRUCTIONS & INFORMATION
## How to change your number

### What to know before changing your wireless number

- You can change your number for free within 30 days of activation. After 30 days, there'll be a $36 change fee charge.
- Your monthly service charge will be prorated between your old and new numbers.
- Write down any important voicemail messages tied to your old number, as they won't transfer.
- You need to create a new greeting for your new number.

### Get a new number

1. Go to Account & services > **My wireless**.
2. Scroll and select the **device you want to transfer a number to** > **Manage device & features**.
3. Select **See more device options** > **Change a wireless number**.
4. Follow the prompts to get a new number.

### After changing your number

**Important details**

- There isn't a feature to provide callers with your new number. Callers dialing your old number will hear: **The number you dialed is not a working number, please check the number and dial again.**

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 25
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

**Verizon**[11]

Ability: No frequency limitation listed. No fee.



---

[11] https://www.verizonwireless.com/support/change-mobile-number-faqs/ (Link last accessed November 9, 2017.)

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 26
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1

2 **T-Mobile[12]**

3       Ability: No frequency limitation listed. No fee for Pay in Advance plans.

4       $15 fee each time for other plans.

5

6  Learn how to change your phone number. There are a few reasons why you might want to change your wireless number, such as if you're receiving someone else's phone calls or if you recently moved.

7  Things to keep in mind:

8  • T-Mobile charges a $15 fee to change your phone number. If you're on a Pay in Advance plan, you're exempt from this fee.

9  • Changing your mobile number will delete all voicemail messages. You'll need to set up a new voicemail box for your new number. See phone how tos for voicemail access steps.

10 • Phone number changes can take up to 4 hours to complete.

11 • Caller ID systems for landline carriers can take up to 3 days to show the correct calling information.

12 • It may take up to 3 days to be able to access My T-Mobile ⧉ using your new mobile number.

13 To change your phone number, contact T-Mobile Customer Service.

14

15       •  **Subscriber-vs-User:** Even if there were reliable sources to determine the identity

16 of subscribers from a historical perspective, this information does not definitively identify

17 authorized users (who would be the recipients of the actual call or text), who may have

18 provided prior express consent to call/text their mobile telephone numbers during the

19 normal course of business. Wireless carriers may know the identity of the owner of the

20 account (i.e., the subscriber) in which a telephone number is held, but often do not know

21 the identity of the user of a telephone number in that account, if it is a multiline account.

22 The reason for this is *none* of the main wireless carriers—AT&T, Verizon, T-Mobile,

23 Sprint—require subscribers to provide the identities of each user on their account. In

24 family plans, family members and/or friends share one wireless plan, and a single

25 subscriber's name is associated with all the telephone numbers on the account. For

26

---

[12] https://support.t-mobile.com/docs/DOC-2862 (Link last accessed November 9, 2017.)

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 27
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

example, I have five telephone numbers associated with my AT&T account, which are assigned to the mobile telephones for myself, my spouse, my daughter, and my son-in-law, and to my iPad. However, AT&T associates all of these telephone numbers with my name, and does not even know the name of my spouse, daughter and son-in-law.

Similarly, many employers provide mobile devices to their employees which could be used for personal as well as business purposes. The business or government agency is the "subscriber" and is billed for the services, while the employees are authorized users. Employees may be the called or texted parties and they have the ability to provide prior express consent to the calls. Wireless carriers are unaware of the identity of individual employees who are authorized users. These telephone numbers are also subject to frequent reassignment to new users as employees migrate in, out, and around these organizations.

• **Pre-paid Telephones:** Pre-paid telephone services, or "burner" phones, introduce another difficulty in determining current as well as historical user information. A pre-paid wireless account is one in which the customer may have a short-term relationship with the wireless services provider and is not billed for service. Rather, the customer purchases usage credits in advance, and fees are deducted from the customer's account as it is used. Pre-paid cellphones appeal to many consumers for many reasons. For example, one of the great thing about pre-paid is consumers can switch at a moment's notice, no expensive early termination fees. The flexibility to switch carriers or change cellphones at will appeals to people who move around, especially those in the military who might be sent overseas. If such consumers move and find that a different carrier offers better coverage, they are not stuck with a contract.

Pre-paid plans also appeal to consumers who may not qualify for a two-year contract because of credit issues. With a pre-paid plan, the carrier is not extending any

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 28
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    subsidy to the consumer, therefore they do not have to check if the consumer is a good

2    credit risk or not.

3         Parents of teens may use pre-paid plans to control minutes. It is a great way to

4    ensure that there are clear limits and zero chance of overage. Once the pre-paid amount

5    has been used up, the consumer is cut off. The consumer can always reload at any point,

6    but it is an easy way for parents to keep track of their child's usage.

7         The problem with accurately researching companies that offer, or offered at the

8    time period in question, pre-paid telephone services is that the carriers such as Boost or

9    Tracfone are really just mobile virtual network operators (MVNOs). In other words, they

10   run on a larger carrier's network and just brand it themselves. For example, Boost Mobile

11   runs on Sprint's network. When performing a network level search for a Boost mobile

12   number, it is going to show Sprint because that is the network actually being used.

13        The recipient number could have been a landline that more than four years back

14   was not set up for text-to-speech technology and bounced the incoming SMS into

15   unknown cyber space. Also, there is a lot of movement in the business arena of pre-paid

16   and wireless telephone carriers, which could account for these unknown networks. For

17   example, Cricket (Leap Wireless) was acquired by AT&T in 2014. In 2014 Sprint was

18   considering bringing back the remains of the Nextel brand it had turned off a year or two

19   earlier, when it turned off the iDEN network. In October 2010 Pocket Communications

20   announced a merger with Cricket Communications. In April 2012 U.S. Cellular and Alltel

21   Wireless announced that they had joined together to begin offering U Prepaid, a no

22   contract wireless service, in select Walmart Stores. Shenandoah Telecommunications

23   Company ("Shentel") acquired nTELOS earlier this year. Rural Cellular Corp. was

24   purchased by Verizon Wireless in January 2009. Trying to go back four or more years to

25   identify customers that most likely were never known to the pre-paid telephone carriers

26   in the first place, in my opinion, will not yield reliable, if any, results.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 29
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    A central problem in identifying subscribers and users of pre-paid wireless
2    numbers is that buyers of these services are generally not required to provide a name or
3    any other identifying information to purchase the services. Several states have tried to
4    enact laws to require buyers of these telephones to provide their names, however, I am
5    unaware of any such legislation having been passed into law. Even if it had, that would
6    be problematic because there are no verification procedures to ensure true names are
7    given. So, at the end of the day, even if a certain pre-paid provider required information,
8    because verification is often over the telephone, there is no way to ensure accurate
9    subscriber information is provided. And because no traditional bill is generated, there is
10   no incentive to provide accurate subscriber information. The often-used term "burner
11   phone" encompasses this very issue.

12   It is also the case that pre-paid numbers do not always appear to be pre-paid. For
13   example, I have researched and studied telephone numbers that were unquestionably
14   known to be assigned to pre-paid cellphone providers recently that were scrubbed by
15   running them through NPA/NXX data out of curiosity, just to see the results. The outcome
16   described was that the results are highly unreliable, for example:

17   Tracfone often appears as Verizon or T-Mobile or Cingular

18   Boost Mobile often appears as Sprint or Nextel

19   Go Phone often appears as AT&T

20   Accordingly, the number of pre-paid numbers at issue may be much higher than what
21   appears on the face of the relevant documentation. This is due to the aforementioned fact
22   that most pre-paid phone service providers are actually providing services through other
23   carrier networks.

24   •   **Mobile Virtual Networks (MVNO):** Another layer of difficulty in determining
25   historical user identities of mobile telephones is the increasingly common practice of
26   "wholesaling." Virgin Mobile, for example, actually provides all of its mobile subscriber

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 30
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

services through Sprint. Sprint wholesales bandwidth to Virgin Mobile. Therefore, Virgin Mobile subscribers are actually on the Sprint network, though Sprint would not have any information, historical or otherwise, pertaining to these subscribers), which further complicates the ability to reliably associate subscribers.

•       **Skip Tracing:** Skip Tracing methods are sometimes employed, usually by creditors or collectors in an attempt to locate persons or specific information about persons, such as an updated address or name. Skip Tracers generally rely upon two basic techniques to find this information. The first is the Internet, where publicly available information includes social media sites and search engines, and the second is fee-based data mining vendors, such as Accurint, ChoicePoint, Locate Plus, and a host of others. In my experience, Internet-based mobile telephone identity services do not provide consistent, unequivocal, or reliable information regarding current or historical cellular telephone users.

•       **Reverse Look-up:** As a preliminary matter, it is my experience that reverse look-up databases are not a reliable and consistent means to determine historic subscriber information. To determine the historic subscriber for a particular number one can run a reverse look-up through various databases (*i.e.*, Intelius, Whitepages, Yellowpages, Spokeo, 411.com) that provide such services.

Although I have attempted this test several times in the past with different service providers, for the purposes of this report, recently I again attempted to identify the user of a mobile telephone number with which I am very familiar. For this test I used www.peoplefinders.com. Similar to others, this website claimed to be able to locate "owners" of mobile telephones.[13]  I recently entered into the search query the mobile telephone number my spouse uses and has used for more than ten years on our family plan, where I am listed as the subscriber. The return search indicated that there was an

---

[13] See claims and testimonials at https://www.peoplefinders.com/reverse-phone.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 31
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    available match of information; however, in order to review this information, I could

2    either join the service as a member for recurring monthly fees or I could pay a one-time

3    fee of $3.95 to view this single record of information. I paid the $3.95 to view the

4    information available for my spouse's mobile telephone, which is 770-843-XXXX. (See

5    Exhibit B). Below is a summary of the results:

| Category | True Information | Reported Information |
|---|---|---|
| Owner/User | My Spouse | Ken Sponsler |
| Mobile Provider | AT&T | None Found |
| Address | Beverly Hills, FL | NE Atlanta |
| Email address | Bellsouth Account | None Found |

12        My previous experience with these Internet mobile user identity services has

13    produced similar results. In my opinion, this source of identifying members of the class

14    is completely unreliable. Over the past four years, this is the fourth different reverse look-

15    up provider I have consulted, all with similar results of incorrect or no information. In my

16    opinion, this source of identifying members of the class is completely unreliable.

17        Such reverse look-up databases also list the telephone carrier for such numbers,

18    which can then be cross-referenced with the North American Numbering Plan

19    Administration (NANPA)—the organization that is responsible for assigning all

20    telephone numbers across North America. However, neither reverse look-up services nor

21    NANPA provide any information about the identities of previous subscribers to the same

22    number. In other words, while it may be possible to determine that Person A is the current

23    subscriber to a particular number, these tools do not make it possible to determine either

24    (a) how long Person A has been the subscriber, or (b) who the previous subscriber(s) to a

25    particular number might have been or (c) the identity of authorized users who may have

26    been the recipients of the call or text.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 32
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

Reverse look-up databases will also often provide information that is contradictory to or inconsistent with other similar databases. For example, it is often the case that, for a given number, Database A will provide different information than Database B. This is why reverse look-ups produce significant false positives.

• **Subpoena Telephone Carriers:** My experience in multiple TCPA cases indicates that carrier responses to subpoenas are widely variable and thus will be an unreliable means to identify class members across different carriers. AT&T, for example, will not provide subscriber information without first advising subscribers and providing them an opportunity to object. Before it will release any information / call detail records ("CDRs"), it will contact every subscriber associated with the numbers that match the parameters of the subpoena to inform them of the subpoena and their rights. AT&T subscribers have up to fourteen days to reply. If AT&T receives the subscribers' consent, it will produce the record. If AT&T receives no reply, it will produce the record. Subscribers, who object to the release of their CDRs, must file a Motion to Quash with the respective courts. Depending on the location of the court (county, state, etc.) this can be a quick or a very drawn-out process. My recent experience with carrier responses to subpoena also reveals that some have refused to respond at all citing legal objections. Even when carriers do respond, their information often does not account for authorized users of telephones associated to an account. This factor, as noted above, is prevalent in family shared plans as well as business or governmental issued telephones. Carriers will only be aware of the primary account holder or subscriber but be completely unaware of family, friend or employee users associated with these accounts. Carriers are also under no obligation to maintain historical account records when subscribers have ported their numbers to other carriers, which presents growing problems given the frequency with which consumers change providers. Assuming it is even possible to issue a subpoena for each and every telephone carrier to identify subscribers to the relevant telephone

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 33
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

numbers, this still leaves unanswered the question which telephone carrier serviced the telephone numbers during the class period.

If and when telephone companies do respond to subpoenas, they provide the information they are legally required to retrieve from archives at a price because they have to dedicate employees and resources to that job, therefore, they generally charge for this. Depending on the number of records and how far back they are told to search their archives, the charges can be extremely, if not prohibitively, high. For example, AT&T charges a one-time $35.00 processing fee to produce CDRs under subpoena. On top of that, it charges $10.00 for each record for each month, i.e., if ten thousand (10,000) records had to be produced for a twelve-month time period, the cost would be $10 x 10,000 records x 12 months = $1,200,000.00 (one million two hundred thousand dollars) plus $35.00 processing fee.

•   **Text Messages to Landlines:** The evidence in this case includes several Excel spreadsheets identified as "sent" data. I randomly selected one of these files for review. The file I selected was "PM0000398 – sent_messages" - Excel. Row "H" is populated by the identification of the "carrier" supposedly servicing the mobile telephone number indicated in Row G of the spreadsheet. Of the 33,210 rows of data representing "sent" texts, 9,425 carrier fields (row H) are blank. While it is unclear of the specific factors that resulted in why these 9,425 fields are blank, there are several possible explanations that would contribute to the unlikely reliable identification of the intended recipients. For instance, similar to my experience in other SMS/text data analysis work, residential landlines could have been forwarded into the text program. My research and experience show that whether residential landlines are capable of receiving text messages (also referred to as "Text-to-Speech") widely varies today and more so back in the fall of 2013. Depending on the carrier, there is a strong likelihood, especially in 2013 (see Pre-Paid Telephones), when the messages at issue would have been transmitted, that text messages

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 34
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

sent to these residential numbers would disappear into a void without being delivered and without any notification to the sender. Obviously, this phenomenon would call into question whether those particular SMS/texts could have violated the TCPA. Additionally, it is possible that blank Row H fields indicate pre-paid or MVNO servicers instead of traditional mobile carriers. As explained in other sections of this report, these factors greatly increase the difficulty in reliably identifying intended recipients.

•   **National Change of Address NCOA site (U.S. Postal Service):** NCOA<sup>LinkTM</sup> is a secure dataset of approximately 160 million change-of-addresses going back 48 months that enable mailers to update mailing lists with new addresses from individuals, families and businesses that have moved. The USPS® has introduced **NCOA<sup>LinkTM</sup>** to replace NCOA and *FASTforward*® Mailing List Correction (MLC) services. Mailers were required by the USPS® to switch to the new **NCOA<sup>LinkTM</sup>** technology instead of National Change of Address (NCOA) on October 1, 2004 or replace *FASTforward*® MLC by October 1, 2005. In other words, even in the unlikely event that names and addresses could be determined for the proposed classes at the time of this report, the U.S. Postal Service's database only goes back 48 months or four years and would no longer include more than one month of address changes because the time frame exceeds those 48 months. And even then, this process presents a host of problems: It is estimated that **only 66.9 percent of mail is deliverable as addressed**. The remaining percentage has some form of addressing deficiency which could affect deliverability. Endorsed mail and First-Class mail can be forwarded or returned to the mailer, Standard Mail™ A class is normally discarded. NCOALinkTM will reduce the amount of undeliverable mail by Address Standardization and ZIP™ Correction as well as Move Update, but will not completely eliminate undeliverable mail. Some examples of returned mail NCOALinkTM not corrected are:

-   Someone who moves and does not notify the United States Postal Service®.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 35
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1      - The match to the COA file is not good enough to meet United States Postal Service®
2      requirements for licensees to provide a forwarding address.

3      - Someone who has moved and filled out the address change form, but the information
4      has not yet been added to the **NCOA$^{\text{LinkTM}}$** database.

5      - Someone who has moved and filled out the address change form, but the information
6      never added to the **NCOA$^{\text{LinkTM}}$** (e.g. data quality issues)

7      - **NCOA$^{\text{LinkTM}}$** processing does not validate name and address information on your
8      database. The NCOALinkTM database contains Change-of-Address information
9      only. If a person or company files a change of address with the United States Postal
10     Service® the information is maintained on the NCOALinkTM database for 48
11     months. If a person or company does not file a change of address and the carrier does
12     not file a "Moved – Left No Address" it does not appear on the NCOALinkTM
13     database. Additional reasons a person/company would not be maintained on the
14     NCOALinkTM database are:

15        • The person/company still lives at the address on user's database.

16        • The person/company may have filed a temporary move (for example a college
17          student moves home for the summer).

18        • Person may be deceased.

19      - **NCOA$^{\text{LinkTM}}$** will not correct spelling errors in user's names or addresses. Address
20     Standardization will standardize user's addresses to postal regulations and may also
21     correct some street name misspellings. DSF2™ also has the ability to correct
22     misspelled street names.

23     **Summary of Opinions:** There are no objective and administratively feasible means to
24 reliably identify subscribers or authorized users of mobile telephones from a historical
25 perspective. While the documents I have been provided reflect the telephone numbers and in
26 some cases the telephone carriers of the proposed class members during the relevant time period

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 36
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

1    (with the start date of both suggested class periods stretching back more than four years), there

2    is no reliable way at this point to identify the called parties because it is impossible to identify

3    who were the subscribers and authorized users at the time. Accordingly, it is my opinion that the

4    members of the putative class at issue in this case cannot be reliably identified through use of

5    administratively feasible and objective procedures.

6    **X.      Reservation of Right to Amend**

7          I reserve the right to amend this report based on information received after issuance of

8    the same. I declare under penalty of perjury under the laws of the United States that the foregoing

9    is true and correct and this declaration was executed on this 22nd day of November, 2017 at

10   Beverly Hills, Florida.

11

12

13

14

15   _____

16   Ken Sponsler

17

18

19

20

21

22

23

24

25

26

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 37
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# EXHIBIT A

# EXHIBIT A

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 1
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800



# <u>Curriculum</u> Vitae

**Kenneth R. Sponsler, CECP, CIPP/US**
**CompliancePoint**
**4400 River Green Parkway, Suite 100**
**Duluth, GA 30096**
**(770) 255-1020**
**www.compliancepoint.com**
ksponsler@compliancepoint.com

**Current Employment**:

Senior Vice President of CompliancePoint, Inc., a global professional services firm specializing in consulting and audit services.

**Education**:

120 hours of undergraduate study; 4.0 GPA (no degree conferred) University of Maryland; Troy University; City College of Chicago; Park University.

**Registrations, Licenses, Certifications**:

- Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE)
- Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP)
- Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO)

**Specialized Training**:

- U.S. Army Command Sergeant Major Course; First in Class
- Advanced Non-Commissioned Officers' Course; Distinguished Graduate

**Professional Experience**:

Seventeen years of general consultation practice concerning U.S. federal and state telemarketing operational compliance with a variety of national and global companies. Provides regulatory and operational compliance consulting services for telemarketing, email, mail, fax, SMS/text communications, and debt collection matters. Ken Sponsler has been designated as an "expert" in U.S. Federal District

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 2
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

Court and provided expert opinions in numerous TCPA and TSR-related matters. CompliancePoint specializes in seller and telemarketer compliance, call center operations, compliance assessments, audits, and forensic call and call abandonment data analysis, with a focus on operational assessments, risk identification, gap analysis, and implementation of compliance policies, procedures and strategies. The consulting practice includes seller/service provider relations, contracting, record keeping, training, monitoring, and enforcement. Effective November 1, 2017 Ken serves as the Vice Chairman of the board and member of the Executive Committee of the National Board of Directors at PACE. Additionally, Ken has provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. A retired U.S. Army Command Sergeant Major, he concluded his career as the Senior Enlisted Leader of the 3rd Infantry Division, leading a 23,400-man elite combat team.

**Publications and Webinars (including CompliancePoint products)**:
- *2016 Compliance Review - 2017 Forecast, Regulatory Updates, Feb 2017*
- *Text Message Compliance Webinar – September 2016*
- *2014 Compliance Review - 2015 Forecast, Regulatory Updates, Feb 2015*
- *2013 Compliance Review - 2014 Forecast, Regulatory Updates, Feb 2014*
- *Strategies For Compliance With New TCPA Requirements, March 2012*
- *Employment Placement Verification, February 2012*
- *2011 Compliance Legislation Review & 2012 Forecast, January 2012*
- *What Impacts Will The TCPA Changes Have On Your Business? Feb 2012*
- *Periodic Regulatory Information Charts*

- *Monthly Compliance Article for customer distribution (2007 – 2014)*

**Awards/Honors**:
- PACE 2016 Pioneer Award for the Difference Ken's Dedication and Support has made with PACE and the Industry, awarded by Professional Association of Customer Engagement
- PACE 2014 Chairman's Award for Distinguished Leadership and Service to the Industry
- Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007
- 18 separate personal awards by the US Army, including the Legion of Merit

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 3
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

**Memberships:**

- *American Teleservices Association* (now PACE)
  – Member, National Board of Directors
  – Member, Self-Regulatory Organization Trustee
  – Federal Legislative Committee Member
  – State legislative Committee Member
  – "Do Not Call" Implementation Committee Member
  – Compliance Officer's Forum Member
- *Professional Association of Customer Engagement, Southeast Chapter*
  – Member, Board of Directors
- *International Association of Privacy Professionals*
  – Consumer Marketing Working Group
- *Direct Marketing Association*
  – Teleservices Committee Member

**Presentations and Colloquies:**

Frequent speaker at industry events, including PACE Annual Convention; Direct Marketing Association Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble Users' Conference; and Quarterly Compliance Focused Webinar Presentations.

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 4
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# EXHIBIT B

# EXHIBIT B

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 5
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800



DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 6
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

# EXHIBIT C

# EXHIBIT C

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 7
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

**Exhibit C – Documents Reviewed by Ken Sponsler**

- Plaintiff's First Amended Class Action Complaint; Document 93; January 9, 2017

    o   Exhibit A

- Declaration of Verkhovskaya, Anya; Document 137; October 26, 2017

    o   Exhibit A; Document 137-1; Verkhovskaya Résumé

    o   Exhibit B, Document 137-2; Verkhovskaya's Representative List of TCPA Cases

    o   Exhibit C; Document 137-3; Cases in Which Verkhovskaya Has Given Deposition or Trial Testimony

    o   Exhibit D; Document 137-4; Source Files (85 pages)

    o   Exhibit E; Document 137-5; Representative List of Cellular Identification Cases

    o   Exhibit F; Document 137-6; Representative List of Reverse-Append Cases

    o   Exhibit G; Document 137-7; Screenshot by statista "Market share of wireless subscriptions held by carriers in the U.S. from 1st quarter 2011 to 1st quarter 2017"

- Declaration of Brawley, Andrew; Document 21; September 24, 2015

- Stipulated Motion and Protective Order; Document 64

- Sample Text Data Provided for Expert Review

    o   Phizzle Samples

    o   Waterfall Samples

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 8
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Anthony Todaro*
Anthony Todaro, WSBA No. 30391

WEST\278921577.1

DECLARATION OF KEN SPONSLER IN SUPPORT
OF RESPONSE TO MOTION FOR CLASS
CERTIFICATION - 9
No. 3:15-cv-05307-RBL

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104-7044 | Tel: 206.839.4800